# No. 14-56636

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## CONTEMPORARY SERVICES CORPORATION
*Plaintiff and Appellant,*

*v.*

## LANDMARK EVENT STAFFING SERVICES, INC.,
## PETER KRANSKE AND MICHAEL HARRISON
*Defendants and Appellees.*

### ON APPEAL FROM SUMMARY JUDGMENT
United States District Court
Central District of California
Case No. SACV 09-00681 BRO (ANx)
[The Honorable Beverly Reid O'Connell]

# ANSWERING BRIEF OF APPELLEES
# LANDMARK EVENT STAFFING SERVICES, INC., PETER KRANSKE
# AND MICHAEL HARRISON

### THE AVANZADO LAW FIRM

MELVIN N.A. AVANZADO (BAR NO. 137127)
ELAINE W. YU (BAR NO. 280008)
1880 CENTURY PARK EAST, SUITE 1100
LOS ANGELES, CALIFORNIA 90067
310.552.9300 TELEPHONE
310.388.5330 FACSIMILE

*Attorneys for Defendants and Appellees*
*Landmark Event Staffing Services, Inc.,*
*Peter Kranske and Michael Harrison*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Ninth Circuit Rules of Appellate Procedure,

Defendants and Appellees Landmark Event Staffing Services, Inc. ("Landmark"),

Peter Kranske ("Kranske") and Michael Harrison ("Harrison") (collectively,

"Appellees") hereby disclose that Landmark is a Delaware corporation with no parent

or subsidiary corporations, and that no publicly held company owns 10% or more of

Landmark's stock, all of which are owned by Kranske and Harrison.

DATED:  October 5, 2015

**THE AVANZADO LAW FIRM**

By:_____
      Melvin N.A. Avanzado
Attorneys for Defendants and Appellees
Landmark Event Staffing Services, Inc.,
Peter Kranske and Michael Harrison

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................1

II. JURISDICTIONAL STATEMENT ......................................................2

III. STATEMENT OF ISSUES ..................................................................3

    1.    Did the District Court properly grant summary judgment when CSC failed to identify its alleged trade secrets with particularity? ................................................................................3

    2.    Did the District Court properly grant summary judgment on CSC's documents which do not derive independent economic value from being generally unknown to the public? ...........................3

    3.    Did the District Court properly grant summary judgment because CSC produced no admissible evidence that would make Appellees liable for Haskell's conduct? .................................4

    4.    Can the District Court's decision be affirmed because CSC failed to produce any admissible evidence that Appellees caused CSC any damages? ....................................................................5

IV. STATEMENT OF THE CASE ...............................................................5

    A.    FACTUAL BACKGROUND .......................................................5

        1. The Parties ..............................................................................5
        2. The Multiple Lawsuits ............................................................6

        a.    Kranske/Zumwalt Litigation ...........................................6
        b.    CSC/Haskell Washington Action .....................................7
        c.    This Action .......................................................................7

    B.    THE RECORD ON APPELLEES' SUMMARY JUDGMENT MOTION ......................................................................8

        1. CSC Failed To Identify Its Trade Secrets ..............................8
        2. The Nature Of CSC's Documents .........................................10

        a.    The "Deployment Workbook" .......................................11

            i.    CSC's Deployment Workbook Was Created By A Part-Time Employee With "Almost No" Training ........................11
            ii.    CSC's Deployment Workbook Performs Basic Math Functions .................................................................12

i

        iii. The Information In CSC's Deployment Sheets Are Commonly Known To The Industry ......................................13

    b. CSC's "Financial Information" ....................................14
    c. CSC's "Library" ............................................................15
    d. CSC's "Customer Information" ...................................16

  3. CSC's "Dark Narrative" Is Based On Speculation And Unsupported By Admissible Evidence ................................17

V. THE DISTRICT COURT'S JUDGMENT SHOULD BE AFFIRMED............34

A. SUMMARY OF ARGUMENT..............................................34
B. STANDARD OF REVIEW....................................................35
C. CSC'S FAILURE TO IDENTIFY ITS TRADE SECRETS IS FATAL ..................................................................................35
D. CSC'S DOCUMENTS ARE NOT TRADE SECRETS ....................38

  1. CUTSA Authorities Compel The Conclusion That CSC's Documents Are Not Trade Secrets ......................................38
  2. CSC Misrepresents The District Court's Legal Analysis ....................41
  3. The Record Below Establishes That The District's Grant of Summary Judgment Was Proper .......................................42

    a. Kranske's Indisputable "Skill" In The Industry ............................42
    b. The Nature Of CSC's Documents Establish That They Are Not Trade Secrets .........................................................43

        i. The Deployment Workbook ...................................43
        ii. CSC's "Financial Information" ............................46
        iii. CSC's "Library" ...................................................49
        iv. Customer Information ............................................53

E. APPELLEES ARE NOT LIABLE FOR HASKELL'S CONDUCT...................................................................................55

  1. Haskell Acted Outside The Scope of His Employment........................55
  2. Appellees Are Not Directly Liable For Haskell's Conduct ................58

    a. CSC Improperly Presents Unpled Theories On Appeal...............58
    b. CSC's "Ratification" Argument Is Barred And Meritless ...........59
    c. CSC Misrepresents "Evidence" To Argue That Appellees Used CSC Materials.......................................................60
    d. CSC Has No Evidence That Harrison Or Kranske Knew Or Should Have Known Haskell Took CSC Documents...................62

        e.    CSC Confuses Speculation With Inferences ..................................63

   F.    CSC IMPROPERLY RELIES UPON INADMISSIBLE
        EVIDENCE AND EVIDENCE IT DID NOT CITE TO THE
        DISTRICT COURT .......................................................................65

    1.  CSC Cannot Rely On Evidence Not Cited Below ...............................65
    2.  CSC's Failure To Appeal The District Court's Evidentiary
       Rulings Precludes Citations To Excluded Evidence ...........................67

   G.   CSC PRESENTED NO ADMISSIBLE EVIDENCE THAT
        APPELLEES CAUSED ANY DAMAGES .......................................68

VI. CONCLUSION ...................................................................................69

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Abba Rubber Co. v. Seaquist*,
  235 Cal.App.3d 1 (1991) ...................................................................46

*Aetna Bldg. Maint. Co. v. West*,
  39 Cal.2d 198 (1952) ......................................................................45

*Agency Solutions.Com*,
  819 F.Supp.2d 1001 (E.D.Cal.2011) ...........................................*passim*

*Ajaxo, Inc. v. E*Trade Group, Inc.*,
  135 Cal.App.4th 21 (2005) ..............................................................64

*Allied Mutual Ins. Co. v. Webb*,
  91 Cal.App.4th 1190 (2001) ............................................................60

*American Paper & Packaging Products v. Kirgan*,
  183 Cal.App.3d 1318 (1986) ..............................................39, 42, 54

*Bancroft-Whitney Co. v. Glen*,
  64 Cal.2d 327 (1966) ......................................................................47

*Cal Francisco Inv. Corp. v. Vrionis*,
  14 Cal.App.3d 318 (1971) .........................................................46, 47

*Carmen v. San Francisco Unified Sch. Dist.*,
  237 F.3d 1026 (9th Cir.2001) ...............................................65, 66, 67

*Contemporary Services Corporation v. Staff Pro Inc.*,
  152 Cal.App.4th 1043 (2007) ..........................................................12

*Diodes, Inc. v. Franzen*,
  260 Cal.App.2d 244 (1968) ...............................................36, 41, 54

*Edmunds v. Atchison, Topeka & Santa Fe Railroad Co.*,
  174 Cal.246 (1917) .........................................................................60

*Fas Technologies, Ltd. v. Dainippon Screen Mfg.*,
  2001 U.S.Dist.LEXIS 7503 (N.D.Cal. 2001) ...................................68

*Forsberg v. Pacific Northwest Bell Tele. Co.*,
840 F.2d 1409 (9th Cir.1987) ..................................................................66

*GAB Bus. Servs., Inc. v. Lindsey & Newsom Claim Servs., Inc.*,
83 Cal.App.4th 409 (2000) ..............................................................46, 47

*Guidroz-Brault v. Missouri Pacific Railroad Co.*,
254 F.3d 825 (9th Cir.2001) ..................................................................67

*Hilderman v. Enea TekSci*,
551 F.Supp.2d 1183 (S.D.Cal.2008)....................................................47

*The Hyman Companies, Inc. v. Brozost*,
964 F.Supp. 168 (E.D.Pa.1997) ...........................................................49

*IDX Systems Corp. v. Epic Sys. Corp.*,
285 F.3d 581 (7th Cir.2002) ..........................................................37, 41

*IMAX Corp. v. Cinema Technologies, Inc.*,
152 F.3d 1161 (9th Cir.1998) .......................................................*passim*

*Independent Towers of Wash. v. Washington*,
350 F.3d 925 (9th Cir.2003) ..................................................................67

*La Calhene Inc. v. Spolyar*,
938 F.Supp. 523 (W.D.Wis.1996) .........................................................48

*Lakeside-Scott v. Multnomah County*,
556 F.3d 797 (9th Cir.2009) ..................................................................63

*Lisa M. v. Henry Mayo Newhall Memorial Hospital*,
12 Cal.4th 291 (1995) .....................................................................56, 57

*Lujan v. National Wildlife Federation*,
497 U.S. 871 (1990).........................................................................35, 63

*LVRC Holdings LLC v. Brekka*,
581 F.3d 1127 (9th Cir.2009) .........................................................35, 63

*MAI Systems Corp. v. Peak Computer, Inc.*,
991 F.2d 511 (9th Cir.1993) ..................................................................36

*Management and Engineering Technologies International, Inc.*,
490 Fed.Appx.30 (9th Cir.2012)...........................................................48

*Mary M. v. City of Los Angeles*,
54 Cal.3d 202 (1991) .................................................................. 56, 57

*Moss, Adams & Co. v. Shilling*,
179 Cal.App.3d 124 (1986) ................................................................ 54

*NORCAL Mutual Ins. Co. v. Newton*,
84 Cal.App.4th 64 (2000) ................................................................. 60

*PFS Distribution Co. v. Raduechel*,
492 F.Supp.2d 1061 (S.D.Iowa 2007) ................................................ 49

*Reeves v. Hanlon*,
33 Cal.4th 1140 (2004) ..................................................................... 46

*Rent Info. Technology v. Home Depot U.S.A.*,
2008 U.S.App. LEXIS 4675 (9th Cir.2008) ................................... 40, 58

*In re Schmidt-Henderson*,
2010 Bankr. LEXIS 4168 (Bankr. W.D.Wash. 2010) ........................ 45

*Self Directed Placement Corp. v. Control Data Corp.*,
908 F.2d 462 (9th Cir. 1990) ....................................... 51, 52, 53

*Silvaco Data Systems v. Intel Corp.*,
184 Cal.App.4th 210 (2010) ............................................................. 39

*Silvas v. E*Trade Mortg. Corp.*,
514 F.3d 1001 (9th Cir.2008) ........................................................... 59

*Snead v. Metropolitan Property & Casual Insurance Co.*,
237 F.3d 1080 (9th Cir.2001) ........................................................... 35

*Sunbelt Rentals, Inc. v. Head & Engquist Equipment, LLC*,
174 N.C.App. 49 (2005) ................................................................... 48

*Surfvivor Media, Inc. v. Survivor Prods.*,
406 F.3d 625 (9th Cir.2005) ....................................................... 35, 58

*T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Assn.*,
809 F.2d 626 (9th Cir.1987) ............................................................. 64

*Trandes Corp. v. Guy F. Atkinson Co.*,
996 F.2d 655 (4th Cir.1993) ............................................................. 37

*US Investigations Svcs. v. Callihan*,
   2012 U.S.Dist. LEXIS 55094 (W.D.Pa.2012) ...................................................49

*Whyte v. Schlage Lock Co.*,
   101 Cal.App.4th 1443 (2002) ...........................................................................48

*Winston Research Corp. v. Minnesota Mining & Mfg. Co.*,
   350 F.2d 134 (9th Cir.1965) .............................................................................53

*Yamaguchi v. Harnsmut*,
   106 Cal.App.4th 472 (2003) .......................................................................56, 57

*Yield Dynamics, Inc. v. TEA Sys. Corp.*,
   154 Cal.App.4th 547 (2007) ...................................................39, 40, 41, 46, 53

## STATUTES

18 U.S.C. §1030 ....................................................................................................3

28 U.S.C. §1291 ....................................................................................................3

28 U.S.C. §1331 ................................................................................................ 2-3

Cal. Civ. Code §3426.1(d) ..................................................................................39

Cal.Civ.Code §3426.3(a) ....................................................................................69

Wis. Stat. §134.90(1)(c) ......................................................................................42

## RULES

9th Cir.R.30-1.4(a)(vii) .......................................................................................68

Fed. R. Evid. 201 ................................................................................................11

## OTHER AUTHORITIES

Restatement (First) of Torts . ..............................................................................47

Restatement (Third) Unfair Competition .............................................................40

# I.

## **INTRODUCTION**

Appellant Contemporary Services Corporation ("CSC") appeals from the District Court's order granting summary judgment in favor of Appellees on its trade secret based claims. As described below, the District Court's rulings followed applicable authorities and the evidence presented by the parties.

CSC identified 23 documents with hundreds of pages as the allegedly misappropriated documents upon which its claims were based. Pressed for the requisite details on summary judgment, "CSC made it very difficult to decipher precisely what information it claims constitutes 'trade secrets.'" (ER23.) The District Court found that "CSC appears to be making a concerted effort to obfuscate the issue…[and that] CSC made no attempt to clarify…what exactly it is claiming the trade secrets at issue are." (ER23-24.) CSC continues to evade such details concerning its trade secrets on appeal.

As this Court has made clear, any trade secret analysis begins with the requirement that claimant identify its "trade secrets" with sufficient particularity to "separate" the claimed trade secrets from the "general knowledge in the trade" or the "specialized knowledge" of those "skilled in the trade." A plaintiff's failure to comply with this particularity requirement is fatal to its claims. CSC does not, because it cannot, show that its documents derive independent economic value. CSC failed to carry its burden to identify its trade secrets with particularity.

On appeal, to distract the Court from its inability to specify its trade secrets, CSC focuses its arguments on its purported "evidence" of misappropriation. As the District Court held, the analysis of what constitutes a protectable "trade secret" is independent of whether that document was misappropriated. Moreover, as detailed below, CSC misrepresents the evidence or simply speculates. The District Court found that CSC tells a "story of suspicion and conspiracy, which it colors with facts taken out of context and accompanied by CSC's dark narrative" and that CSC "has no evidence whatsoever" to connect unrelated events. (ER37.) A close examination of the "evidence" CSC presents exposes CSC's speculation and lack of admissible evidence.

In sum, CSC avoids the specificity concerning its "trade secrets" because such details reveal that it has no protectable trade secret information. CSC's "evidence" of misappropriation is based on CSC's conjecture and dark fantasy. The District Court applied correct substantive law to the record presented. This Court should affirm that judgment.

## II.

## <u>JURISDICTIONAL STATEMENT</u>

Appellees agree with CSC's jurisdictional statement. (Op.Br. 1.) To wit, the District Court properly exercised federal question jurisdiction under 28 U.S.C. §1331 based on CSC's claim under the Computer Fraud and Abuse Act (18 U.S.C. §1030). This Court has appellate jurisdiction under 28 U.S.C. §1291.

**III.**

**STATEMENT OF ISSUES**

**1.      Did the District Court properly grant summary judgment when CSC failed to identify its alleged trade secrets with particularity?**

Yes.  As detailed in Section V.D *infra*, CSC failed to identify the alleged trade secrets at issue with the requisite particularity.  CSC uses general and vague buzzwords like "library," "recipe for success," "financial information" and "formulae" to describe what information within the 23 documents at issue could possibly be trade secret.  The District Court found that "CSC appears to be making a concerted effort to obfuscate the issue" and that "CSC made no attempt to clarify for the Court what exactly it is claiming" as trade secrets.  (ER23-24.)  CSC's failure to identify its trade secrets with the requisite particularity – standing alone – is sufficient to affirm summary judgment.

**2.      Did the District Court properly grant summary judgment on CSC's documents which do not derive independent economic value from being generally unknown to the public?**

Yes.  As detailed in Section V.E *infra*, CSC's documents do not contain information which derives independent economic value from being unknown to others.  CSC must show with admissible evidence that its "trade secrets" derive "value" from being unknown to others and to "separate" them from matters of general knowledge, or of special knowledge of persons skilled, in the trade.  CSC

3

does not satisfy its burden by pointing to hundreds of documents and claiming that those documents are helpful or useful to another person in carrying out a specific activity or allow someone to save time. The District Court correctly held that CSC failed to satisfy its burden.

**3.** **Did the District Court properly grant summary judgment because CSC produced no admissible evidence that would make Appellees liable for Grant Haskell's conduct?**

Yes. As detailed in Section V.F *infra*, Appellees presented admissible evidence to establish that alleged misconduct of Grant Haskell ("Haskell") was outside the scope of his employment. Landmark hired Haskell on the express condition that he not take anything from CSC. In response to this evidence, CSC presented the District Court with "a story of suspicion and conspiracy…color[ed] with facts taken out of context and accompanied by CSC's dark narrative" – unsupported by admissible evidence. (ER37.) CSC's argument that the Landmark Parties are directly liable for Haskell's conduct is unsupported by admissible evidence. (ER37-39; *see also* SER0015 (CSC's counsel admitting that it was "absolutely true" that CSC had "no direct evidence showing that Mr. Kranske changed the metadata").) CSC's reliance upon inadmissible evidence and speculation, as well as its misrepresentations of the evidence, supports the District Court's grant of summary judgment.

**4.** **Can the District Court's decision be affirmed because CSC failed to produce any admissible evidence that Appellees caused CSC any damages?**

Yes. As detailed in Section V.G *infra*, CSC's only evidence of its damages submitted before the District Court was an expert witness report (the "CSC Damages Report") which presented CSC's claimed damages of "likely Net Lost Profits." (SER0945-48.) However, the CSC Damages Report failed to show that these "likely Net Lost Profits" were caused by Appellees' alleged misappropriation or other conduct. Because CSC presented no evidence that Appellees caused it any damages, the District Court's order can also be affirmed on this basis.

**IV.**

**STATEMENT OF THE CASE**

**A.** **FACTUAL BACKGROUND**

**1.** **The Parties**

CSC was founded by Kranske and his then-partner Damon Zumwalt ("Zumwalt"). (ER6; SER0282-84 ¶¶1-3, 5.) CSC provides event-staffing, security and crowd management services for concerts and sporting events. (ER5; ER1122 ¶13.)

Landmark also provides event staffing, security and crowd management services. (ER6; ER1107 ¶23.) Landmark directly competes with CSC. (ER1107 ¶23.) Kranske founded Landmark with Harrison after Zumwalt fired him from

5

CSC. (ER6; ER1104 ¶3; SER0320 ¶70.) Kranske is an "industry titan" and "industry leader" who "built CSC to what [it is] then and [is] today" (SER0303 ¶36, SER0307 ¶44.)

### 2. The Multiple Lawsuits

#### a. Kranske/Zumwalt Litigation

Kranske filed suit against Zumwalt to secure payment for his ownership interest in CSC (the "Kranske/Zumwalt Litigation"). (ER6-7; SER0991 ¶3; SER0426 ¶274.) Zumwalt then filed a cross-complaint against Kranske. (ER7; Dkt. 219 at 3.) The parties settled the case pursuant to a settlement agreement dated as of May 24, 2006. (ER7; SER0426 ¶274.) That settlement expressly allowed Landmark to compete with CSC. (ER7; ER332 ¶6.)[1] Kranske remained a 49% owner in CSC, owner in various CSC affiliates and a member of CSC's board until the parties' settlement. (*See* ER330.)

CSC admits that Kranske was entitled to receive and did receive detailed monthly and annual financial statements, including information for CSC's branches, until CSC repurchased Kranske's ownership in the settlement. (SER0321 ¶71.)

---

1. Zumwalt and CSC expressly acknowledged that "Kranske has formed, is currently operating and will continue to operate and own Landmark Event Staffing Services…which will compete with the business of CSC and the CSC Affiliates." (ER332 ¶6.)

### b.     **CSC/Haskell Washington Action**

Haskell worked for CSC in Seattle until July 7, 2006 when he joined Landmark. (SER0286 ¶8, SER0287 ¶11.) Five months after buying Kranske out of his ownership interest in CSC and settling the Kranske/Zumwalt Litigation, CSC sued Haskell in Washington state court (the "Washington Action"). (SER0453 ¶422.) CSC's claims against Haskell were based entirely on Haskell's alleged theft of CSC's purported trade secrets when he left CSC. (Dkt. 227-1.) The case terminated in a consent judgment on March 19, 2009. (ER7; Dkt. 227-14.)

### c.     **This Action**

CSC filed its Complaint against Appellees on June 2, 2009 – less than three months after the Washington Action concluded. (ER7; Dkt. 1 at 5.) Appellees removed this action on June 9, 2009. (Dkt. 1) On January 13, 2012, CSC filed the operative first amended complaint. (ER8; ER1119-52.) All of CSC's claims were based on Haskell's alleged theft of trade secrets before he resigned from CSC. (ER1119-52 ¶¶9-148).

Appellees moved for summary judgment on all of CSC's claims on July 16, 2014. (Dkt. 219.) The District Court granted the motion in full. (ER5-41.) The District Court entered an amended judgment in Defendants' favor on all nine causes of action. (Dkt. 355.)

**B.** **THE RECORD ON APPELLEES' SUMMARY JUDGMENT MOTION**

The record below establishes that (a) CSC failed to identify its purported trade secrets with sufficient particularity, (b) CSC's documents cannot be trade secrets and (c) Appellees cannot be liable for Haskell's conduct.

### 1. CSC Failed To Identify Its Trade Secrets

The District Court expressly found that "CSC appears to be making a concerted effort to obfuscate" what "trade secrets" are at issue. (ER23.) Two years after CSC filed its amended complaint, Appellees moved to compel CSC to produce the purported trade secrets upon which CSC's claims were based. (Dkt. 111.) The court below granted that motion. (Dkt. 126.) CSC produced 22 physical documents – and no electronic documents – in response to that discovery order. (SER0899-0901.)[2/]

Appellees moved for summary judgment, submitting *all* of the 23 documents CSC claimed to be trade secrets. (ER24-26; Dkt. 219 at 8-11.) CSC evaded any specific details of which portions of these documents constituted trade secrets:

We have never claimed that every single document was in and of itself a trade secret. What we do claim is that as a compilation and as a library, this is CSC's recipe to success. This is how we competed in

---

2. CSC untimely identified another set of documents (CSC California #23) relating to the report of its expert, Allison Goodman. (SER0668-891.) The Landmark Appellees objected to this production as violating the discovery order. (Dkt. 219 at 11 n.6; Dkt. 126 at 5.)

the field and made it and are a leader in the industry. So that is what we're claiming as a trade secret. [¶] We do have individual trade secrets, and we do believe that individual documents – such as the deployment workbook, would constitute a trade secret….

(SER0012.)

On this record, the District Court held that "CSC made no attempt to clarify for the Court what exactly it is claiming the trade secrets at issue are" and "never identified with particularity for the Court what information within these documents constituted trade secrets." (ER24.) The District Court concluded that:

CSC has made it very difficult to decipher precisely what information it claims constitutes "trade secrets"…. Rather, CSC relies on vague allegations to support its misappropriation claim, such as asserting that Defendants took CSC's "library of operational documents," which CSC claims "include[d] confidential documents and trade secrets." Nowhere does CSC specify what these trade secrets *contained in* CSC's "library of operational documents" are, nor can CSC in good faith claim that all of these documents, in and of themselves, constitute trade secrets. In fact, CSC appears to be making a concerted effort to obfuscate the issue….

(ER23 (emphasis and alteration in original; footnote omitted).) The District Court

noted that "CSC cannot simply state, in conclusory fashion, that a 'library of operational materials' is comprised entirely of trade secrets." (ER23n.8.) On appeal, CSC continues to evade a firm position on what its purportedly misappropriated trade secrets are on this appeal. (Op.Br. 9 ("the true extent of what was taken from CSC may never be known").)

CSC's obfuscation and vague descriptions of its "trade secrets" are fatal to its claims and this appeal.

### 2. <u>The Nature Of CSC's Documents</u>

Close examination of CSC's 23 documents exposes the fallacy of CSC's trade secret claims. Haskell allegedly stole all of the CSC documents at issue for Landmark before he left CSC on July 7, 2006. (ER1119-52 ¶¶9-148).) In analyzing whether any of the CSC documents qualified as "trade secrets," the District Court grouped the 23 documents into four categories: (1) documents containing customer information (CSC California #17, 18) ("Customer Information"); (2) documents containing CSC financial information (CSC California #11, 19) ("Financial Documents"); (3) CSC's Microsoft Excel deployment workbook (CSC California #12) ("Deployment Workbook") and (4) CSC's compilation of its operational materials (CSC California #1–10, 13–16, 20-23) ("Library"). (ER25-27.)

Of these categories, the District Court ruled that three – Deployment Workbook, Financial Documents and Library – were not trade secrets as a matter

of law.  (ER28-33.)  The District Court held that there was a triable issue regarding whether Customer Information could possibly be a trade secret.  (ER28.)

### a.  The "Deployment Workbook"

CSC focuses on its "deployment workbook" – claiming that this document is "sophisticated" and "complex" because it contains "a series of formulae" that allegedly "link individual deployment worksheets" together.  (Op.Br. 10-11, 53.)  CSC never identifies the "formulae" or any details on what makes the document – a simple Excel spreadsheet – "complex."[3]  The reason for that is simple:  CSC's employees admit that the "formulae" are "basic math" created by persons with little or no training.

### i.  CSC's Deployment Workbook Was Created By A Part-Time Employee With "Almost No" Training

Luis Uribe ("Uribe") supposedly created CSC's deployment workbook.  (SER0193-94.)  Uribe was a part time employee of CSC's affiliate.  (SER1097 ¶9.)  Uribe alone created the deployment sheets with "minimal" to "almost no training" on the computer or on Excel. (SER0197-98.)[4]  Uribe consulted with others

---

3.	Pursuant to Rule 201 of the Federal Rules of Evidence, Appellees request judicial notice of the following facts not subject to reasonable dispute and generally known in this jurisdiction:  (a) Excel is a spreadsheet program manufactured and sold by Microsoft; (b) Excel is available for sale to anyone.  *See* <https://products.office.com/en-us/excel>

4.	CSC submitted a declaration from Uribe, directly contradicting Uribe's deposition testimony, in which CSC claimed to provide Uribe with training prior to his work to create CSC's deployment workbook.  (ER16-17.)  CSC has previously
(cont'd)

regarding "basic Excel techniques" such as widening columns, cutting and pasting and referenced an Excel instruction manual to insert a "counting" formula. (SER0198-99.)

### ii.    CSC's Deployment Workbook Performs Basic Math Functions

Uribe and CSC's vice president of operations, Jay Brock ("Brock"), confirm the basic Excel functions of this Deployment Workbook. Brock testified that he made "modifications and improvements" to the deployment sheets Uribe created – making those deployment sheets an "interlinked, interactive tool" containing a "series of formulas." (ER76-77 ¶¶3-7].) However, Brock admitted that he did not need training in Excel to perform the modifications on this tool. (SER0266-67.) Even with his "modifications and improvements," Brock testified that the deployment workbook is nothing more than an Excel spreadsheet with basic math functions, stating:

> I started adding counts...well, first I just started with just the counts,
> very simple, here's how many people per sheet, and it would load up
> at the top of the sheet. If you made any changes on it, at the very top it

---

(cont'd)

been found to have fabricated declaration evidence against a competitor, resulting in sanctions against CSC. *Contemporary Services Corporation v. Staff Pro Inc.*, 152 Cal.App.4th 1043, 1048 (2007) (holding that CSC used litigation "as a form of unfair competition" to present derogatory information about the competitor to its clients). The District Court below struck this declaration evidence. (ER16-17.)

would tell you here's how many event staff you have or ticket-takers

or ushers.

(SER0265.)

Brock admitted that the deployment workbook used only "addition and

multiplication" formulas – "that's a fair statement" – and that the "operants" he

used in the spreadsheet were "basic math." (SER0266-68.) Uribe testified to

adding basic "counting formulas." (SER0193-95, 0199.)

### iii. The Information In CSC's Deployment Sheets Are Commonly Known To The Industry

CSC contended below that its deployment sheets were a "proprietary tool"

which contained "complex details unique to each event, such as the number of staff

required for the event by position and location, number of radios, names of

individuals, their designated position, a command post log, and a worksheet for

incident reports, cost estimates for the event, etc." (ER30; Dkt. 251 at 9.) CSC,

however, "also concede[d] that other companies use deployment plans, and that

these plans typically contain 'the positions worked during the day and who worked

those positions' as well as where people are posted, how many people are to be

posted." (SER0322-25 ¶¶74, 81-82, 84; ER30.)

From this record, the District Court found that there was no triable issue of

fact that the information contained within CSC's deployment sheets – *i.e.*, the

"number of radios, names of individuals, their designated position, a command

post log, and a worksheet for incident reports, cost estimates for the event" – are "common factors that are obvious to any competitor in the event staffing and security industry" and "necessarily elements that every company in the industry must consider." (ER31.) The District Court concluded that CSC "has not demonstrated anything in the spreadsheet that someone with common knowledge in the industry could not create." (ER30.)

### b. CSC's "Financial Information"

CSC claimed as trade secrets the "Financial Information" – an employee salary sheet (CSC California #19) and a CSC Seattle branch revenue and expense report for 2004-05 (CSC California #11). (ER938-39; 1016.) The 2004-05 report contains information about sales, costs, expenses, gross profit, including a year to year comparison. (ER938-39.) The salary sheet is dated January 1, 2006 and shows the salaries of Haskell, one other employee and an "additional hourly" figure. (ER1016.) The sheet also shows Haskell's "car allowances." (ER1016.) This sheet also has figures for the office budget, projected office sales, actual office sales through "1/05," actual office budget through "1/05," "sales difference" and "office budget difference." (ER1016.)

The District Court ruled that there was no triable issue of fact as to whether these two documents were trade secrets. (ER28-29.)

### c.    **CSC's "Library"**

The District Court grouped 17 of CSC's 23 documents at issue into the

heading of "CSC's compilation of its operational materials" (ER27) – *i.e.* the

Library. The Library contains four sub-category of documents.  (1) CSC's "By The

Book" corporate meeting notebook containing the 2006 meeting agenda, general

forms, overviews of the corporate structure, sexual harassment policy forms (CSC

California #1; ER357-409).  (2) PowerPoint slides – containing presentations by

third party vendors on minimizing liability claims, proper footwear and state

licensing requirements (CSC California #s4 -7; ER635-87, 689-95), a presentation

on hurricane Katrina and disaster preparedness and recovery (CSC California #8;

ER744-97), financial data of CSC branch offices from 2004-2005 (CSC California

#2; ER408-618), group recruiting and training presentations on general principles

such as establishing rapport and training on sexual harassment issues (CSC

California #9-14; ER798-937, 977-90), summaries of CSC employee benefits

(CSC California #3; ER619-34).  (3) Four documents relating to CSC operations –

a "Supervisor Briefing" sheet with reminders to report guest complaints, medical

calls, brief staff, uniform attire, and smile and greet guests (CSC California #15;

ER 991), "Seahawk Staff Briefing" sheet with reminders on uniforms, game

schedule, first aid locations, assigned responsibilities, smoking and eating policies,

and upcoming events (CSC California #16; ER 992), the one page "Everett A-Z

Guide" summarizing points of interest within the Everett Events Center (CSC

California #20; ER 1018), the "Everett Events Center Bag Search Post Orders" on proper bag search procedures and prohibited items. (CSC California #21; ER 1019.) (4) Documents related to the report of CSC's expert Allison Goodman. (SER0667-892).)[5/]

### d. CSC's "Customer Information"

The last group of CSC documents analyzed by the District Court were two documents relating to "customer information." (ER27-28.) This Customer Information consists of 2003 and 2004 invoices for two Seattle area CSC clients (CSC California #17; ER993-1007) and "Detail Historical Aged Trial Balance" which shows payments made by CSC Seattle's client venues from 2004 through 2006. (CSC California #18; ER1008-1013.) CSC provided these kinds of detailed monthly and annual financial information to Kranske through at least May 24, 2006. (SER0321 ¶ 71.)

---

5. Appellees objected to CSC's untimely production of the documents comprising CSC California #23 (Dkt. 219 at 11 n.6) since CSC sought to expand its "trade secrets" beyond the 22 documents it produced in response to the court's April 19, 2013 discovery order. (*See* Dkt. 126 at 5.) The District Court did not rule on that objection and analyzed CSC California #23 as part of CSC's Library. (ER31-33.)

3. **CSC's "Dark Narrative" Is Based On Speculation And Unsupported By Admissible Evidence**

CSC's Opening Brief essentially presents to this Court the same "story of suspicion and conspiracy…color[ed] with facts taken out of context and accompanied by CSC's dark narrative" (ER37) which CSC presented below.

Appellees hired Haskell on the express condition that he not take or use CSC materials. (ER342-43 ¶¶3-5; ER345-52 & 353; SER0287-88 ¶¶ 11-13, 15.) Landmark required Haskell to confirm by declaration his verbal representations that he did not take CSC proprietary materials or trade secrets. (ER353.) Kranske also reminded Haskell by email that he was not to use CSC materials. (ER213-15.) The District Court described CSC's response to this undisputed evidence:

> CSC essentially argues that all of this evidence only corroborates its theory that Defendants authorized Haskell's alleged misappropriation. According to CSC, the paper trail that Harrison and Kranske left, in which they clearly prohibit Haskell from taking anything from CSC, was an intentional act in anticipation of litigation….CSC paints a story of suspicion and conspiracy, which it colors with facts taken out of context and accompanied by CSC's dark narrative. Although the Court is cognizant of its duty to draw inferences in CSC's favor as the non-moving party, these inferences must be reasonable and based on admissible evidence. *Plaintiff has no evidence whatsoever to*

*demonstrate that these facts—such as Haskell being in Seattle at the same time as Harrison, or that Haskell downloaded CSC files the same day that he received legal advice from Landmark—are at all related.* The Court will not draw an inference based on a party's hunch. And the Court will certainly not draw an inference of collusion and conspiracy based on an employer's evident attempts to prevent its employee from breaking the law.

(ER37 (emphasis added).)

Both below and on appeal, CSC strings together the following unrelated facts taken out of context and not grounded upon admissible evidence. If analyzed closely, CSC's lack of evidence for its "dark narrative" is exposed.

| CSC'S PURPORTED "FACT" | APPELLEES' RESPONSE AND THE ACTUAL STATE OF THE EVIDENCE |
|---|---|
| • Harrison "lured" Haskell to join Landmark. (Op.Br. 1, 5 (citing ER342-43 (Harrison declaration)). | CSC's presents no evidence that Haskell was "lured" by anyone. To the contrary, the cited declaration states that Haskell approached Harrison about potential employment at Landmark and that Landmark conditioned hiring Haskell upon Haskell not taking or using CSC |

| CSC's Purported "Fact" | Appellees' Response and The Actual State of the Evidence |
|---|---|
|  | material. (ER341-43 ¶¶3-5.) |
| • Harrison "used CSC files saved on an external hard drive," indicating Appellees were "willing to use CSC materials." (Op.Br. 4, 35 (citing ER1033-34 (Goodman report) and 257-259 (declarations from Washington Action).) | As detailed in Section V.F.1 *infra*, CSC cannot rely upon these documents in the Goodman report because CSC did not refer to these documents in the District Court. In addition, Goodman makes statements concerning documents which CSC did not present into evidence in violation of the best evidence rule – to which District Court sustained similar objections. (ER15-16.) The Washington Action declarations are also inadmissible; the District Court judicially noticed declarations from the Washington Action only "for the limited purpose of acknowledging that they exist" – not for the facts contained therein. (ER9.) CSC does not (because |

| CSC's Purported "Fact" | Appellees' Response and The Actual State of the Evidence |
|---|---|
| | it cannot) cite to admissible evidence that Harrison or any of Appellees had knowledge that any of the documents found on Landmark computers were supposedly CSC's documents. Finally, CSC's pleadings do not allege any claims or facts regarding Harrison supposedly taking CSC's materials. (*See* ER1119-52.) |
| • "On April 19, 2006, Harrison traveled to Seattle and met with Haskell. Harrison also visited Everett Events Center, a major customer of CSC's Seattle office at the time." (Op.Br. 6 (citing ER180-83 (Landmark 30(b)(6) deposition).) | CSC takes this evidence out of context. The full testimony shows that the purpose of Harrison's trip to Seattle on April 19, 2006 was to meet with Everett Events Center and a company called Labor Ready. (ER180-81.) Harrison "stopped by" CSC's Seattle office, "stuck [his] head in and said hi to everybody in the office" – |

| CSC'S PURPORTED "FACT" | APPELLEES' RESPONSE AND THE ACTUAL STATE OF THE EVIDENCE |
|---|---|
| | including Haskell. (ER182.) Harrison testified that he was there for 5-10 minutes. (ER182.) |
| • By late April 2006, Haskell's name was on Harrison's "Key Personnel" list which "targets numerous CSC employees potentially interested in joining Landmark" – including Haskell – and "Haskell began telling CSC coworkers about an offer to work for Landmark." (Op.Br. 5, 6 (citing ER121-124 (Edens deposition), ER244 ("Key Personnel" document) and ER1077 (Goodman Report).) | CSC misrepresents this evidence. CSC ignores the full title of this "list" – "Potential Key Personnel Who Have Inquired Or May Inquire About Employment With Landmark" – which does not "target" anyone. (ER244, 1077.) CSC officers and employees (Brock, Lambert, Lavin and Uribe) also appear on this "list" but remain employed with CSC. CSC also misrepresents cited deposition testimony. (ER123 at 84:12-84:15 ("Q. During this conversation that we've been discussing, did [Haskell] tell you that he had an offer from Landmark? A. |

| CSC's Purported "Fact" | Appellees' Response and The Actual State of the Evidence |
|---|---|
| | Not a specific offer, that they just talked to him….)  Finally, as detailed in Section V.F.1 *infra*, CSC is precluded from relying on this document in the Goodman report because CSC did not refer to this document in the proceedings below. |
| • Haskell used CSC's May 16-20, 2006 corporate meeting to "gather CSC's trade secrets" including the "By the Book" notebook handed out and PowerPoint presentations shown during the meeting.  (Op.Br. 7, 35-36.) | CSC cites no evidence to support this purported "fact." |
| • Haskell was "already planning to leave CSC" when he attended the May 16-20, 2006 corporate meeting.  (Op. Br.7 (citing ER62 (Granger declaration)). | CSC misrepresents this evidence. Granger's declaration states only that he "later learned that, at the time Haskell attended the corporate meeting, he already had planned to resign his |

| CSC's Purported "Fact" | Appellees' Response and The Actual State of the Evidence |
|---|---|
| | employment at CSC to go work for Landmark." (ER62 ¶25.) Granger's "testimony" does not reveal how he purportedly "later learned" of this "fact" and concerns matters outside of Granger's personal knowledge. The District Court sustained Appellees' objections to "testimony" outside CSC declarants' personal knowledge. (ER15 ("Defendants raise a number of objections to statements based on lack of personal knowledge. Indeed, some of these statements concern matters of which the declarant would have no personal knowledge....Defendants' objections on this basis are therefore sustained.").) |

| CSC's Purported "Fact" | Appellees' Response and The Actual State of the Evidence |
|---|---|
| • On May 22, 2006, Haskell "confirmed his interest in working for Landmark." (Op.Br. 7 (citing ER144 (Haskell's deposition) & 208 (Haskell's email to Harrison dated May 22, 2006)). | CSC misrepresents this evidence. Haskell's cited testimony does not testify to a date or that he "confirmed" his interest in working for Landmark. Instead, the cited testimony concerns Harrison referring Haskell to an attorney "shortly after corporate meetings in May 2006" and the circumstances under which Landmark volunteered to pay for the attorney regarding Haskell's employment with CSC. (ER144.) Haskell's email states only "Hey Mike, it was good seeing you at the IAAM Conference in Boise…I just returned from corporate meeting with CSC and I am not sure I like the direction CSC is headed. You told me you and Pete started your own company and I would |

| CSC's Purported "Fact" | Appellees' Response and The Actual State of the Evidence |
|---|---|
| | like to talk to you and see what's going on. Please call me…." (ER208.) |
| • "On June 14, 2006, Harrison again traveled to Seattle and met with Haskell. During Harrison's visit, Haskell sent to his personal e-mail account additional confidential and proprietary CSC materials." (Op.Br. 7, 36 (citing ER221-29 (emails from Haskell to his personal email with attachments that were sent on June 14, 16 and 28, 2006).) | CSC misrepresents this evidence. There is no evidence that Harrison met with Haskell when he went to Seattle in June 2006. There is no evidence connecting Haskell's emails to himself with Harrison's trip to Seattle – other than the coincidence of time. The District Court recognized that CSC had "no evidence whatsoever to demonstrate that these facts – such as Haskell being in Seattle at the same time as Harrison…are at all related." (ER29.) In addition, as discussed in Section V.F.1 *infra*, CSC is precluded from relying on Haskell's emails because it did not present the emails to the District |

| CSC's Purported "Fact" | Appellees' Response and The Actual State of the Evidence |
|---|---|
|  | Court.  In fact, CSC's failure to present these emails below caused the District Court to sustain Appellees' best evidence rule objections to references to these emails.  (*See* ER15-16 ("Defendants' objections [based on violation of the best evidence rule] are sustained as to CSC's statements regarding…the emails that Haskell claims that he sent to himself.").) |
| • On July 5, 2006, "Haskell met with an attorney (paid-for by Landmark) to discuss Haskell's employment agreement with CSC.  That same day, Haskell began downloading onto various USB devices files from Haskell's CSC computer." (Op.Br. 8, 36 (citing ER88-93, 90-95 (Goodman Declaration), 185-186 (Landmark | As detailed below in Section V.F.1*infra*, CSC cannot rely on evidence cited for the first time on appeal.  (Op.Br. 8, 36.)  CSC never presented these emails and Paragraphs 35, 37 and "Exhibit 1" of the Goodman Declaration to the District Court.  CSC also misrepresents the evidence.  The emails do not show that |

| CSC's Purported "Fact" | Appellees' Response and The Actual State of the Evidence |
|---|---|
| 30(b)(6) deposition testimony) & 237-41 (emails between Harrison and Steven Serratore ("Serratore").) | Haskell "met with" Serratore. The emails show Harrison and Serratore discussing the rate for Serratore to review the CSC non-compete agreement and have a "discussion" with, and sending a letter to, Haskell. (ER237-41.) The cited deposition testimony does not show that Haskell "met with" Serratore; the testimony shows that Landmark agreed to a proposed rate and time for Serratore regarding these matters. (ER185-186.) Goodman's Declaration makes statements concerning documents which CSC did not offer into evidence in violation of the best evidence rule – to which District Court sustained similar objections. (ER15-16.) |

| CSC's Purported "Fact" | Appellees' Response and The Actual State of the Evidence |
|---|---|
| • Haskell "lied about his future plans" when he resigned from CSC on July 7, 2006. (Op.Br. 9, 36 (citing ER62-63 (Granger declaration) & 1026 (Goodman Report).) | CSC is precluded from relying upon this portion of the Goodman Report which it cites for the first time on appeal. (Op.Br. 1026.) CSC also misrepresents this evidence. Granger's declaration and the Goodman Report are silent on Haskell's "future plans." Without further evidence, Haskell's "future plans" are outside Granger's and Goodman's personal knowledge – to which District Court sustained objections below. (ER15.) In addition, Goodman's Report makes statements concerning documents which CSC did not present into evidence in violation of the best evidence rule – to which District Court sustained similar objections. (ER15-16.) Also, Haskell |

| CSC's Purported "Fact" | Appellees' Response and The Actual State of the Evidence |
|---|---|
| | testified that did not ask for any PowerPoint slides and that he left the documents from the May 2006 corporate retreat behind and only brought back with him an empty binder shell. (SER1723-26 (Haskell dep.) ("Q. So I'm clear, your testimony is, I did get some handouts, I left them all in the cabin and I took the empty notebook with me back to Seattle? A. That is correct.") |
| • Kranske's emails were part of Landmark's "paper trail to give the illusion that a condition of Haskell's employment was not to take or use CSC's proprietary materials." (Op.Br. 15, 49-50 (citing ER 213-14 (emails from Kranske to Haskell).) | CSC provides no admissible evidence that Kranske's emails were illusory or part of a "paper trail." Appellees told Haskell in express terms that he was not to take or use CSC materials. (*See* ER342-43 ¶¶3, 5 (Harrison's declaration).) The cited emails show |

| CSC's Purported "Fact" | Appellees' Response and The Actual State of the Evidence |
|---|---|
| | Kranske's reminder to Haskell not to use CSC materials. (*See* ER214-215 ("Do not refer to csc (*sic*) info to compile this or any other project. We must find our own resources. However anything that you can remember is fine."); ER213 ("Grant, we can't use csc's. (*sic*) I can remember what we did. I will recreate it. Although I did that, I will recreate it to keep us within the law.") When confronted with evidence of Appellees' "evident attempts to prevent its employee from breaking the law," CSC's lawyer disregards it (without citing evidence) as "attempts to cover their tracks." (SER0013; ER37.) |

| CSC's Purported "Fact" | Appellees' Response and The Actual State of the Evidence |
|---|---|
| • Haskell's hiring declaration and employment agreement with Landmark were part of a "paper trail" to make it appear that Haskell could not take or use anything from CSC. (Op.Br. 15-16, 49-51 (citing ER345-52 (Landmark employment agreement with Haskell), 353 (Haskell's hiring declaration).) | CSC presents no admissible evidence that Haskell's declaration and employment agreement with Landmark were illusory or part of a "paper trail." Appellees told Haskell in express terms that he was not to take or use CSC materials. (*See* ER345-53 (Haskell's employment agreement with Landmark and hiring declaration).) As the District Court held, when confronted with evidence of "an employer's evident attempts to prevent its employee from breaking the law," CSC simply rejected it as "attempts to cover their tracks." (SER0013; ER37.) |
| • "Six hours after learning by e-mail that Haskell had retained CSC materials, Harrison made revisions to Haskell's | CSC cites evidence for the first time on appeal. (Op.Br. 49-50.) As detailed in Section V.F.1*infra*, CSC is precluded |

| CSC's Purported "Fact" | Appellees' Response and The Actual State of the Evidence |
|---|---|
| employment agreement, but made no changes to Haskell's declaration which falsely stated that Haskell had returned all CSC materials."  Op.Br. 38, 50 (citing ER 210-11 (Harrison emails to Haskell) & 213-14 (Kranske's emails to Haskell).) | from relying on emails between Harrison and Haskell since CSC failed to cite them for the District Court.  CSC also misrepresents the cited email exchange between Kranske and Haskell. Although Haskell says he has lanyard cards "from a while back," Kranske instructs Haskell that they "can't use csc's (*sic*)."  (ER213.)  There is no reference to any other CSC documents – CSC has never claimed "lanyard cards" to be trade secrets.  CSC's reference to "revisions" in the employment agreement fails to mention that Harrison made "a procedural change" – concerning the effective date of the agreement – which was "[n]othing substantive."  (ER210-11, 345.)  In addition, CSC has no authority for its |

| CSC'S PURPORTED "FACT" | APPELLEES' RESPONSE AND THE ACTUAL STATE OF THE EVIDENCE |
|---|---|
| | claim that Harrison was required (a) to revise Haskell's hiring declaration after Haskell signed it in light of this evidence, (b) terminate Haskell or (c) suspect Haskell took other documents or actual "trade secrets" from CSC. |

CSC makes other "misleading" factual contentions. CSC contends "numerous files on Landmark computers showed CSC-specific metadata was changed to make the documents…appear to have been authored by Landmark." (Op.Br. 17-18; Dkt. 251 at 9, 18.) However, CSC cites only one purportedly changed file ("deployment.xls") – not "numerous files" – and that single file was found only on Haskell's Landmark computer (and Haskell's CSC computer) and not on multiple "Landmark computers." (Op.Br. 17-18; Dkt. 291 (Opp.) at 18; ER90-92 ¶¶20-27.) CSC and its expert found *no* evidence that Harrison or Kranske changed any metadata. (*E.g.*, SER0015 (CSC's counsel admitting that it was "absolutely true" that CSC had "no direct evidence" Kranske changed metadata.).)

Finally, CSC misrepresents evidence to support its contention that Appellees actually used CSC's Deployment Workbook. (*See* Op.Br. 16-19, 47.) CSC cites

the testimony of Paul Jones, a former Landmark employee who also worked for CSC. (SER0039, 0045.) CSC contends that Jones used "electronic copies" of CSC's Deployment Workbook. (Op.Br. 11-12.) However, Jones was testifying about Landmark's deployment sheets – not CSC's. (*See* SER0041-45, 0056-62; 0066-0102; 0103-40; 0141-81.)

The District Court's order granting summary judgment was properly based on CSC's inability to prove it owns protectable trade secrets as well as its unsupported accusations and misleading characterizations of evidence. The District Court's order should be affirmed.

## V.

## THE DISTRICT COURT'S JUDGMENT SHOULD BE AFFIRMED

## A.    SUMMARY OF ARGUMENT

CSC's claims and contentions on appeal are meritless. CSC failed to carry its burden to identify its purported trade secrets with sufficient particularity. As the authorities under the California Uniform Trade Secrets Act ("CUTSA") make clear, CSC's designation of hundreds of pages of documents does not satisfy its burden, particularly because CSC is required to "separate" its claimed trade secrets from general knowledge in the trade and specialized knowledge of those skilled in the trade. CSC's "story of conspiracy and suspicion" is based on fantasy, speculation and ignoring actual evidence, while CSC does not (because it cannot) produce any contradictory and admissible evidence to raise a triable issue of fact.

CSC also presents no evidence that Appellees caused CSC any damages. Finally, CSC improperly (a) relies upon evidence cited for the first time on appeal, (b) relies upon inadmissible evidence and (c) raises issues not raised below. On these grounds, the District Court's summary judgment should be affirmed.

## B.  STANDARD OF REVIEW

This Court reviews the District Court grant of summary judgment *de novo*. *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630 (9th Cir.2005). This Court must "view[ ] the evidence in the light most favorable to the non-moving party" and decide "whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Snead v. Metropolitan Property & Casual Insurance Co.*, 237 F.3d 1080, 1087 (9th Cir.2001).

"While [this Court] must draw all reasonable inferences in favor of the non-moving party, [it] need not draw inferences that are based solely on speculation." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1136 (9th Cir.2009); *see also Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990) (summary judgment standard does not require all ambiguities to be resolved in favor of non-moving party).

## C.  CSC'S FAILURE TO IDENTIFY ITS TRADE SECRETS IS FATAL

A plaintiff claiming trade secret misappropriation must identify the allegedly stolen trade secrets with particularity. *IMAX Corp. v. Cinema Technologies, Inc.*,

152 F.3d 1161, 1165 (9th Cir.1998); *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir.1993); *Diodes, Inc. v. Franzen*, 260 Cal.App.2d 244, 250-54 (1968). "The plaintiff 'should describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons...skilled in the trade.'" *IMAX*, 152 F.3d at 1164-65 (emphasis in original).

In *IMAX*, defendants moved to compel to identification of allegedly stolen trade secrets. *IMAX*, 152 F.3d at 1165. Eventually, plaintiff identified "every dimension and tolerance that defines or reflects that design." *Id*. at 1166. In affirming summary judgment for defendants, the *IMAX* court expressly rejected the contention that "use of the catchall phrase 'including every dimension and tolerance that defines or reflects that design'" was sufficient "to identify the numerical dimensions and tolerances as trade secrets." *Id.* at 1167-70.

In *MAI*, this Court reversed summary judgment granted in plaintiff's favor. *MAI*, 991 F.2d at 522-23. The *MAI* plaintiff contended that its diagnostic software contained trade secrets. *Id.* at 522. However, the *MAI* plaintiff's evidence "does not specify what these trade secrets are" and only states that the "diagnostic software 'contain valuable trade secrets of MAI.'" *Id.* The *MAI* court held that "[s]ince the trade secrets are not specifically identified, we cannot determine whether [defendant] has misappropriated any trade secrets" and reversed the summary judgment in plaintiff's favor. *Id.* at 522-23.

36

Other circuits are in accord. *E.g.*, *IDX Systems Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir.2002) (affirming summary judgment when plaintiff "failed to identify with specificity the trade secrets that it accuses the defendants of misappropriating"). The Seventh Circuit held:

> According to [plaintiff], "a 43-page description of the methods and processes underlying and the inter-relationships among various features making up IDX's software package" is specific enough. No, it isn't. These 43 pages describe the software…it does not separate the trade secrets from the other information that goes into any software package….[Plaintiff's] tender of the complete documentation for the software leaves mysterious exactly which pieces of information are the trade secrets…. [A] plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition.

*IDX*, 285 F.3d at 583-84 (citations omitted). The *IDX* court concluded that "a trade-secret claim based on readily observable material is a bust." *Id*. at 584; *see also Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 661-62 (4th Cir.1993) (rejecting description of "formulas and methods of calculation" as trade secrets because "[w]ithout some evidence of what the formulas were, the jury could not

37

have differentiated them from 'matters of general knowledge in the trade'…."). *Id.* at 662.[6/]

CSC's Opening Brief does not address its failure to identify with particularity its trade secrets.  As the foregoing authorities make clear, CSC cannot rely on generalities and must identify its trade secrets with particularity.  CSC's refusal to do so dooms its claims.

## D.   CSC'S DOCUMENTS ARE NOT TRADE SECRETS

### 1.   CUTSA Authorities Compel The Conclusion That CSC's Documents Are Not Trade Secrets

CUTSA defines "trade secret" as information that "[d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use...and...[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Cal. Civ. Code §3426.1(d).

Plaintiff bears the burden to show that its alleged trade secret derives independent economic value.  *Yield Dynamics, Inc. v. TEA Sys. Corp.*, 154 Cal.App.4th 547, 562-63 (2007).  CUTSA "does not speak of value in the abstract, but of the value that is '[d]erived…from not being generally known to the public or

---

6.    The *Trandes* court affirmed the jury verdict on the alternative grounds that the jury had sufficient evidence to conclude the software at issue constituted a trade secret.  *Trandes*, at 661-62.

to other persons who can obtain economic value from its disclosure or use….'" *Yield Dynamics*, 154 Cal.App.4th at 568.

Matters within "general knowledge in the trade or…special knowledge of those persons who are skilled in the trade" cannot be trade secrets. *Agency Solutions.Com*, 819 F.Supp.2d 1001, 1017 (E.D.Cal.2011); *American Paper & Packaging Products v. Kirgan*, 183 Cal.App.3d 1318, 1326 (1986) (information "generally known in the trade and *already used* by good faith competitors" is "not a protectable trade secret"); *IMAX*, 152 F.3d at 1164-65 (plaintiff must identify trade secret with "sufficient particularity to separate it" from "general knowledge in the trade" or "special knowledge" of persons "skilled in the industry").

"Ideas or concepts are not, in and of themselves, trade secrets." *Agency Solutions.Com*, 819 F.Supp.2d at 1917 (citing *Silvaco Data Systems v. Intel Corp*., 184 Cal.App.4th 210, 221-22 (2010)). Finally, "[p]roprietary ways of doing the same thing that others in the same field do are not trade secrets." *Id.* (citing *Silvaco*, 184 Cal. App. 4th at 221-22).

In *Yield Dynamics*, plaintiff claimed defendants misappropriated computer code used in their programs. After a bench trial, the trial court found that the codes at issue did not derive independent economic value. *Id*. at 561-72. The trial court held that, even though plaintiff "may have kept its source code confidential…there was no evidence that the functions at issue were unknown in the industry." *Id.* at 561 n.13. The DCA affirmed, holding that a trade secret needs to be

> "sufficiently valuable and secret to afford an actual or potential
> economic advantage over others." The advantage "need not be great,"
> but must be "more than trivial." Merely stating that information was
> helpful or useful to another person in carrying out a specific activity,
> or that information of that type may save someone time, does not
> compel a factfinder to conclude that the particular information at issue
> was "sufficiently valuable…to afford an…economic advantage over
> others."

*Id.* at 564-65 (quoting Restatement (Third) Unfair Competition § 39 & comment

e). The *Yield Dynamics* court further concluded that:

> Airplanes need wings to fly, but that does not mean that all wing
> designs have independent economic value. Most of [plaintiff's]
> evidence on this point amounts to *nothing more than the seemingly*
> *self-evident fact that if someone has already written a routine to*
> *perform a given function, access to that code may be of some use to*
> *another programmer who wants to include a similar function in his*
> *own software.* This does not mean that the advantage in any particular
> case is "more than trivial."

*Yield Dynamics*, 154 Cal. App. 4th at 567 (emphasis shifted); *see also Rent Info.*

*Technology v. Home Depot U.S.A.*, 2008 U.S.App. LEXIS 4675 at *4-5 (9th

Cir.2008) (summary judgment for trade secrets defendant affirmed because setting

rental rates for software development deal "derived its value from…increased rate rather than from not generally being known").

### 2.   CSC Misrepresents The District Court's Legal Analysis

CSC mistakenly contends that the District Court improperly adopted a "readily ascertainable" standard.  (Op.Br. 52.)  The phrase "readily ascertainable" and the word "ascertainable" do not appear anywhere in the District Court's order. (ER5 *et seq.*)

Instead, the District Court simply held that CSC is required to describe its trade secrets "with sufficient particularity to separate [the purported trade secrets] from matters of general knowledge in the trade or of special knowledge of those persons…skilled in the industry."  *IMAX*, 152 F.3d at 1164-65 (emphasis deleted). In other words, the District Court followed established authorities that information within "general knowledge in the trade or…special knowledge of those persons who are skilled in the trade" are not trade secrets.  *Agency Solutions.Com*, 819 F.Supp.2d at 1017 (quoting *Diodes*, 261 Cal.App.2d at 253).

CSC bears the burden to identify its "trade secrets" with enough specificity to "separate" those "trade secrets" from "matters of general knowledge" or of "special knowledge" of those in the trade.  CSC's vague and general descriptions are insufficient to satisfy that burden.[7]

---

7.    Other jurisdictions define "trade secrets" to exclude information which is "readily ascertainable by proper means."  *See, e.g.*, *IDX Systems*, 285 F.3d at 583 (cont'd)

### 3. The Record Below Establishes That The District Court's Grant of Summary Judgment Was Proper

#### a. Kranske's Indisputable "Skill" In The Industry

There can be no dispute that Kranske is a person "skilled" in the event staffing and security industry. CSC's personnel described Kranske as an "expert" at running events (SER0312 ¶49; SER1016 ¶49; SER1313-15) and a "mentor." (SER0312 ¶51; SER1168-71.) Kranske has specialized knowledge about event-related operational documents. (SER0514 (CSC's Brock testified that "faced with a specific need, Pete [Kranske] could create a document to deal with that need.").) CSC's vice president of operations could not identify any area of operations in which Kranske lacked knowledge. (SER1017-18 ¶¶52, 61; SER0462-65.) CSC did not – and cannot – dispute that Kranske is an "industry titan" and an "industry leader" who "built CSC to what [it is] then and [is] today." (SER0303 ¶36; SER1014 ¶44; SER1120-21, 1275.)

---

(cont'd)

(quoting Wis. Stat. §134.90(1)(c)). Instead of using that phrase, CUTSA authorities make clear that "matters of general knowledge in the trade" or "special knowledge" of "persons skilled in the industry" do not qualify as trade secrets. *See IMAX*, 152 F.3d at 1164-65; *Agency Solutions.Com*, 819 F.Supp.2d at 1017; *Diodes*, 260 Cal.App.2d at 253. In other words, instead of excluding them in its definition of trade secret, CUTSA requires a plaintiff (like CSC) to prove that its "trade secret" is "separate" from "matters of general knowledge in the trade" or "special knowledge" of "persons skilled in the industry." *IMAX*, 152 F.3d at 1164-65; *but see American Paper*, 183 Cal.App.3d at 1326 (customer lists "may not be generally known to the public [but] they certainly would be known or readily ascertainable to other persons in the shipping business").

### b.  The Nature Of CSC's Documents Establish That They Are Not Trade Secrets

#### i.  The Deployment Workbook

CSC's focuses much of its Opening Brief on its "deployment workbook." (Op.Br. 10-12, 17-19, 47-49, 52-56.)  However, as detailed here, CSC obscures indisputable details regarding the Deployment Workbook to exaggerate the nature of that document.  CSC's witnesses confirm that the deployment workbook is nothing more than an Excel spreadsheet with "basic math" functions created by a part-time employee with no training and modified by another who admits that no training was necessary to perform those modifications.  (SER0193-94 & 0197-98 (Uribe Dep.); SER0266-67 (Brock Dep.).)  CSC admits that "a deployment plan contains 'the positions worked during the day and who worked those positions' as well as where people are posted, how many people are posted." (SER0325 ¶82; *see also* Dkt. 251 at 9 ("These workbooks contain worksheets for each staffing position, gate, door or arena level, and identify the supervisor and individuals for each position and their location within a given position."); SER0269 (Brock Dep.) (workbook contained "radio counts and…the credential log counts" and when necessary the counts for parking personnel, guest services, concierge and ticket-takers.)  CSC also admits that the "work that companies in the event staffing and security industry takes place mostly in the public eye" where "[p]atrons and other

workers at events can observe the number of employees assigned to particular positions." (SER0365 ¶164.)

In the face of these facts, CSC brazenly contends that "[t]here is no evidence that the formulae and interrelationships embedded in the Deployment Workbook were known to others in the event staffing industry." (Op.Br. 53.) CSC misleads this Court on several levels. CSC witnesses make clear that the supposedly secret, undisclosed "formulae" are "basic math" – addition, multiplication, division (SER0266-67 (Brock Dep.) and "basic counting formulas." (SER0199 (Uribe Dep.) Simply put, the allegedly unknown trade secret "formulae" of the deployment workbook – basic math – are taught in grade schools throughout the world.

Moreover, the components of the deployment workbook are known to all companies in the industry – and certainly fall within the "specialized knowledge" of someone skilled in the industry like Kranske. (*See* Dkt. 251at 9 (describing components).) Indeed, CSC acknowledges that its competitors in the event staffing industry keep track of the same things – but claims its competitors do it by hand through "crude manual deployment 'plans'" and "word-processing documents that lack the interactive operability of CSC's interlinked Deployment Workbook." (SER0449 ¶405, ER78 ¶9; Op.Br. 53, 54.)

Thus, the District Court properly concluded that this document cannot be trade secret as a matter of law because CSC did not prove that anything in the

Deployment Workbook can be "separate[d]" from the general knowledge in the industry or Kranske's "specialized knowledge" as a "titan" in the field. *See Agency Solutions.Com*, 819 F.Supp.2d at 1017 ("Proprietary ways of doing the same thing that others in the same field do are not trade secrets."); *Aetna Bldg. Maint. Co. v. West*, 39 Cal.2d 198, 206 (1952) ("procedure for estimating price" not a trade secret because "any competitor…must consider all of the factors [in the] computations"); *In re Schmidt-Henderson*, 2010 Bankr. LEXIS 4168 at *20-21 (Bankr. W.D.Wash. 2010) (excel spreadsheets used as medical billing forms not trade secret since "[t]hey are all forms that could easily be created by a person in the medical billing industry").[8/]

The District Court correctly held that the Deployment Workbook – "basic math" formulae and all – was not a trade secret.

---

8.      CSC makes two other contentions which are contrary to a proper trade secret analysis.  CSC claims the "economic value" of its deployment workbook is established by "Landmark's copying and extensive use of CSC's deployment workbook to run its business" (Op.Br. 54).  Of course, proof that a document was misappropriated does not inform whether it qualifies as a trade secret.  (*See* ER32.) More importantly, the determination of "value" under CUTSA requires more than its tool being "helpful or useful to [Landmark] in carrying out a specific activity." *Yield Dynamics*, 154 Cal.App.4th at 564-65.  Second, by accusing the District Court of speculation when it held "someone with common knowledge in the industry could have created a deployment workbook" (Op.Br.52-54), CSC inverts the proper CUTSA analysis – since it was CSC's burden to show its deployment workbook contained more than what others in the industry could recreate.  CSC failed to carry its burden to provide evidence that its "trade secret" is "separate" from the general knowledge in the industry or specialized knowledge of skilled persons in the trade.  Therefore, both contentions are meritless.

## ii.  CSC's "Financial Information"

CSC's Financial Information – two CSC Seattle branch documents with salary and budget information (CSC California #19) and a revenue and expense report in 2004-05 (CSC California #11) (ER938-939 & 1016) – cannot be trade secrets.  CSC cannot establish that this information derives independent economic value.  *GAB Bus. Servs., Inc. v. Lindsey & Newsom Claim Servs., Inc*., 83 Cal.App.4th 409, 427–28 (2000) (no trade secret in its employees' salaries on the basis that "the information lacked the necessary element of independent economic value"), *disapproved on other grounds by Reeves v. Hanlon*, 33 Cal.4th 1140, 1154 (2004); *Cal Francisco Inv. Corp. v. Vrionis*, 14 Cal.App.3d 318, 322 (1971) (Trade secret "differs from other secret information in a business…in that it is not simply information as to…events in the conduct of the business, as, for example…the salary of certain employees…." (quoting Restatement (First) of Torts §757 cmt. b)).  Moreover, CSC did not (because it cannot) show that this information has "value to other businesses which are unaware of the information and which could put that information, if known, to beneficial use." *Abba Rubber Co. v. Seaquist*, 235 Cal.App.3d 1, 18 (1991).

CSC argues that this information "can constitute a trade secret, especially when combined with other confidential information…." (Op.Br. 57.)  CSC does not (because it cannot) cite authorities which hold that information, which must be combined with other information before it becomes valuable, derives independent

economic value under CUTSA. Thus, the District Court's holding that CSC did not prove that the Financial Information "would benefit other businesses" was proper.

Moreover, CSC's contention that the District Court "overlooked" CSC's authorities (Op.Br. 58) exposes CSC's misunderstanding of the independent economic value analysis. Despite CSC's protestations, the District Court's citation to *GAB Bus. Servs., Inc.*, 83 Cal.App.4th at 427-28, was proper. That case held that "employees' salaries…lacked the necessary element of independent economic value." *Id.* CSC ignores that "secrecy" of information does not equal "economic value." *Id.* at 429; *see also Cal Francisco*, 14 Cal.App.3d at 322 (holding that a trade secret is not the same as "other secret information in a business" such as "the salary of certain employees….").

CSC relies on cases that are inapposite. *Bancroft-Whitney Co. v. Glen*, 64 Cal.2d 327, 350-52 (1966) involved disclosure of "confidential salary information" in a breach of fiduciary duty case. *See GAB*, 83 Cal.App.4th at 429 (finding that the case "does not support [the] argument that confidential salary information has independent economic value"). CSC's other cases involved substantially different information from the Financial Information or laws of other jurisdictions. *See Hilderman v. Enea TekSci*, 551 F.Supp.2d 1183, 1200-02 (S.D.Cal.2008) (granting summary judgment against claimant because "vague puffery or references to proprietary information…is not the same thing as trade secrets," failure to identify

47

what is "unique" about its processes, and contact information for a client, but

denying summary judgment on client lists and differing price lists for customers);

*Whyte v. Schlage Lock Co.*, 101 Cal.App.4th 1443, 1455-56 (2002) (detailed

identification of financial information such as "pricing, profit margins, costs of

production, pricing concessions, promotional discounts, advertising allowances,

volume rebates, marketing concessions, payment terms and rebate incentives"

sufficient to affirm preliminary injunction); *Sunbelt Rentals, Inc. v. Head &*

*Engquist Equipment, LLC*, 174 N.C.App. 49, 56 (2005) (North Carolina case

finding trade secrets in detailed business information about construction lift rental

business but that "the reality is that [defendant] hired the people from [plaintiff]

who had the expertise to run…[the] business effectively and…and the salesmen

who knew the customers and the market"); *US Investigations Svcs. v. Callihan*,

2012 U.S.Dist. LEXIS 55094 at *6 (W.D.Pa.2012) (unpublished district court

memorandum denying summary judgment regarding proposal with pricing, cost

data and staffing information in a proposal on a sealed bid); *Management and*

*Engineering Technologies International, Inc.*, 490 Fed.Appx.30 at *32 (9th

Cir.2012) (unpublished opinion affirming jury verdict finding profit margin and

general and administrative expenses were trade secrets under Arizona law); *La*

*Calhene Inc. v. Spolyar*, 938 F.Supp. 523, 528-29 (W.D.Wis.1996) (injunction

issued under Minnesota trade secrets law on engineering drawings, tests, sales and

profit margin projections and research and development information but not

"detailed customer lists…because the information…is general in nature and…readily obtainable from other sources" ); *The Hyman Companies, Inc. v. Brozost*, 964 F.Supp. 168, 175 (E.D.Pa.1997) (injunction issued under Pennsylvania law against general counsel precluding disclosure of store profitability information to new employer competitor); *PFS Distribution Co. v. Raduechel*, 492 F.Supp.2d 1061, 1082 (S.D.Iowa 2007) (weekly profit and loss reports, product mixes and market share).

The District Court's holding that the Financial Information was not trade secret should be affirmed.

### iii.  CSC's "Library"

CSC's Library contains the largest chunk of documents at issue (17 of the 23 documents CSC produced).  (ER24-26.)  CSC's characterizations of its Library cannot overcome its failure to meet its burden to show that these "operational" materials are "separate" from "general knowledge" of the industry or "specialized knowledge" of persons skilled in event staffing and security industry.  *IMAX*, 152 F.3d at 1164-65.  Both below and on appeal, CSC avoids the details of their documents in hopes of exaggerating their appeal as possible trade secrets.

CSC describes these purported trade secrets with buzzwords like the "corporate 'DNA' of CSC" and CSC's "recipe for success."  (Op.Br. 9, 13, 59, 62, 63.)  In various places, CSC uses more words to describe its Library – albeit without providing any more detail:  "a range of confidential information about

insurance, licensing, employee benefits, and financials" containing "financial

performance details, including each branch's sales, labor costs, gross profit,

operating expenses and earning" and "an overview of CSC's liability insurance and

risk control strategies for workers' compensation." (Op.Br. 6-7, 60.)

On the one hand, CSC claims "the entirety [of the Library]…was

confidential and proprietary." (Op.Br. 65.) On the other hand, CSC says "isolated

bits of the Library compilation might be found scattered among publicly accessible

documents…." (Op.Br. 13.)[9/] The details of these documents doom CSC's case.

The Library are documents presented at CSC's corporate meeting to its

employees, in CSC's employee application, training and orientation process or

used by CSC employees to run events. CSC California No.1 is the 2006 "By The

Book" corporate meeting notebook distributed during CSC's general meeting with

its employees. (Dkt. 219 at 8.) CSC California Nos.2-3 are powerpoint

presentations shown to employees on CSC branch financial rankings and employee

benefits. (ER408-618; ER619-634.) CSC California Nos.4-7 are third party

powerpoint presentations shown at that corporate meeting. (Dkt. 219 at 18;

ER635-743.) CSC California No.8 is a disaster preparedness presentation

including facts regarding Hurricane Katrina. (ER744-797; SER0334 ¶101.) CSC

California No.9 are documents describing CSC's recruiting and training process.

---

9.    CSC makes no attempt to delineate what these "isolated…publicly
accessible documents" could be or to distinguish which parts of the Library are
trade secrets and which are "publicly accessible."

(ER798-845.) CSC California No.10 is a presentation on sexual harassment at CSC's corporate meeting. (ER846-937; SER0335 ¶103.) CSC California Nos.13-14 are training or orientation materials. (ER977-990; SER0337 ¶¶106-07.) CSC California Nos.15-16 are sheets on supervisor and staff briefings. (ER991-992; SER0337-38 ¶¶108-09.) CSC California Nos.20-21 are a Seattle venue's "A-Z Guide" and post orders. (ER1017-1019; SER0339-40 ¶¶113-14.) CSC California No.22 are interview questions for event staff candidates. (ER1010; SER0340 ¶115.) CSC California No.23 is a stack of documents from Goodman with various operational documents. (SER0341 ¶116.)

Upon examining this "Library," the District Court properly concluded that this Court's opinion regarding an employment training program applied. *Self Directed Placement Corp. v. Control Data Corp.*, 908 F.2d 462, 465-66 (9th Cir. 1990). In *Self Directed*, this Court affirmed the district court's grant of summary judgment against plaintiff who claimed that an employment training program was a trade secret. *Id.* at 466. The *Self Directed* plaintiff provided training courses to assist students obtain employment. *Id.* at 463-64. Rather than using plaintiff's services, the *Self Directed* defendant hired an instructor to create a program using the instructor's own knowledge and experience from her employment with plaintiff. *Id.* at 464.

The *Self Directed* plaintiff alleged as trade secrets its specific instruction techniques in the program because they "incorporate[d] 'know how' and 'negative

know-how' attained through accumulated experience." *Id.* at 465. This Court held that plaintiff's techniques were not protectable trade secrets because the program contained "common pedagogical…techniques which would be used in any job placement course" and that it would be "absurd to permit [plaintiff] to appropriate as his own 'secrets'" such common and basic knowledge. *Id.* at 465-66. This Court further held that the training techniques could not be trade secrets because the course content was "completely disclosed to students taking" plaintiff's training program. *Id.*; *see also Winston Research Corp. v. Minnesota Mining & Mfg. Co.*, 350 F.2d 134, 139 (9th Cir.1965) (technical approach "dictated by well known principles of physics" not trade secret because "it consisted…of general engineering principles in the public domain and part of the intellectual equipment of technical employees").

CSC challenges the District Court's citation to *Self Directed* because she supposedly "ignor[ed]"certain documents. (Op.Br. 60 (citing CSC California Nos.1-10).) However, CSC hides the fact that all of these documents were presentation materials provided to CSC's employees at CSC's corporate meeting or documents CSC provides to employees during other training sessions. (ER57 ¶2; SER0388 ¶203; SER0398 ¶219; SER1049 ¶¶197-98; SER1056 ¶220.) Thus, the District Court's analysis that these documents are like the program materials given to students in *Self Directed* was proper. Moreover, like the "course content"

in *Self Directed*, CSC's documents are "completely disclosed" to employees in CSC's meetings. *Self Directed*, 908 F.2d at 465-66.

CSC's contention that it "spent significant time and money compiling this information" demonstrating the Library's "significant value" and that a new company would receive an "unfair head start" with the Library (Op.Br. 62-65) does not establish "independent economic value" under CUTSA. *Yield Dynamics*, 154 Cal.App.4th at 568 (proof of "value" is not "in the abstract" but of "value that is '[d]erived…from not being generally known'"). At most, like with its Deployment Workbook (*see* Section V.D.3.b.1 *supra*), all CSC has shown is it has "[p]roprietary ways of doing the same thing that others in the same field do." *Agency Solutions.Com*, 819 F.Supp.2d at 1017.

CSC's showing is insufficient to establish trade secrets. The District Court's ruling should be affirmed.

### iv.  Customer Information

The District Court held that the Customer Information could be protectable trade secrets – and CSC "agrees" with that portion of the District Court's order. (Op.Br. 14.) Appellees do not.

At issue are two documents – a payables ledger listing payments made by CSC Seattle's clients from 2004 through 2006 (ER1008-13) and invoices for 2003-04 for two Seattle clients (ER993-1007). CSC claims that the Customer Information "disclose CSC customers and their buying practices." (Op.Br. 14.)

CSC's SGI below, as well as the documents themselves, reveal that CSC dramatically overstates the nature of these documents. (*See* SER0440-41 ¶¶367-69 (no disclosure of customer "buying practices").)

In any event, CSC bears the burden to "separate" this Customer Information from the "general knowledge" or "special knowledge" of "skilled persons" in the event staffing and security industry. *Agency Solutions.Com*, 819 F.Supp.2d at 1017 (quoting *Diodes, Inc.*, 261 Cal.App.2d at 253); *American Paper*, 183 Cal.App.3d at 1326.

Kranske was CSC's minority owner who was entitled to (and received) CSC's financial and other information through at least May 24, 2006. (SER0321 ¶71.) Haskell was CSC's Seattle branch manager until July 2006. (SER0285 ¶8, SER0441 ¶370.) As a result, CSC cannot prove that Kranske or Haskell did not have – or was not entitled to – the Customer Information. *Id.*; *see also Moss, Adams & Co. v. Shilling*, 179 Cal.App.3d 124, 127 (1986) (client information acquired through "personal contact" not trade secret misappropriation). Neither Kranske nor Haskell can "be compelled to 'wipe clean the slate of their memories.'" *Moss*, 179 Cal.App.3d at 129.

In sum, *Moss* makes clear that the little "customer information" contained in these documents were not trade secrets. The Customer Information is not trade secrets.

# E.   APPELLEES ARE NOT LIABLE FOR HASKELL'S CONDUCT

CSC presents no admissible evidence to hold Appellees liable for misappropriation of the only document which the District Court found could possibly be a trade secret.  (ER28, 33.)

## 1.   Haskell Acted Outside The Scope of His Employment

Appellees are not liable for Haskell's conduct which contravened the express conditions of his employment.  (SER1005-06 ¶¶12, 15.)  An innocent employer may be liable for the torts its employee commits while acting within the scope of his employment.  *Yamaguchi v. Harnsmut*, 106 Cal.App.4th 472, 481 (2003).  However, an employer will not be liable for conduct that occurs when the employee "substantially deviates from the employment duties for personal purposes" or where the conduct is "so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business." *Id.* at 482.  CSC bears the burden of proving that Haskell's alleged misconduct was "within the scope of his employment" with Landmark.  *Id.* at 482.

Before hiring Haskell, Appellees made clear the conditions of Haskell's employment – expressly prohibiting Haskell from using or disclosing to any member of Landmark "any confidential or proprietary information or trade secrets from any former or current employers" and requiring Haskell to confirm (under penalty of perjury) his verbal representations that he did not take anything from CSC that "might be considered proprietary or in the nature of trade secrets."

55

(ER342-43 ¶¶3-6; 345-53; SER0287 ¶¶11-12.)  Appellees also reminded Haskell

not to use CSC materials. (ER213-14.)  The District Court held that this evidence

established that Haskell acted outside the scope of his Landmark employment.

(ER37.)

CSC cites two cases for the unremarkable proposition that employers under

the *respondeat superior* doctrine may be held liable for employees' criminal acts

*within the scope of employment*.  (*See* Op.Br. 33-34 (citing *Mary M. v. City of Los*

*Angeles*, 54 Cal.3d 202 (1991); *Lisa M. v. Henry Mayo Newhall Memorial*

*Hospital*, 12 Cal.4th 291 (1995)).  Both cases involved employees convicted of

raping victims while on-duty.  *Mary M.*, 54 Cal.3d at 207 (officer raped woman

after traffic stop); *Lisa M.*, 12 Cal.4th at 295-96 (hospital attendant sexually

assaulted patient during examination).  Both cases affirm that CSC bears the

burden to show that conduct was "inherent in the working environment," "typical,"

"broadly incidental" to the employment – and that the employee did not

"substantially deviate" from his employment.  *Yamaguchi*, 106 Cal.App.4th at 482

(quoting *Lisa M.*, 12 Cal.4th at 296, 298-99); *Mary M.*, 54 Cal.3d at 217-19.

Finally, both cases reflect public policies that impose employer liability to

incentivize "preventive measures" against, and to compensate victims for, crimes

committed by on-duty employees.  *See Mary M.*, 54 Cal.3d at 214-18; *Lisa M.*, 12 Cal.4th at 299-304.[10/]

To contend that Haskell acted within the scope of his Landmark employment, CSC downplays certain details.  First, it is beyond dispute that Haskell was a CSC employee when he allegedly took CSC's documents. (ER1121-22 ¶¶9-11, ER1126-32 ¶¶27-48; SER0285-86 ¶¶8&10; SER0288-89 ¶¶14-15; SER0436-41 ¶¶351-70.)  Thus, unlike the rapists in the *Mary M.* and *Lisa M.* cases who were on duty for their employer when they committed the crimes, Haskell's alleged misappropriation took place before he was Landmark's employee.

Second, CSC also disregards the conditions Landmark imposed on Haskell *prior* to hiring him – *i.e.*, Haskell was required to sign documents which represented to his new employer that he did not take CSC documents and returned anything which could be proprietary or trade secret.  (ER345-53.)  These "evident attempts to prevent its employee from breaking the law" (ER37) constitute the preventative measures advanced by the policies behind the *Mary M.* and *Lisa M.* decisions.  CSC does not, because it cannot, produce admissible evidence that Haskell had any employment or agency relationship with Landmark at the time Haskell allegedly took CSC's documents. (SER1005-06 ¶¶9-15.)

---

10.    Unlike violent crime victims generally, *see Mary M.*, 54 Cal.3d at 214-18; *Lisa M.*, 12 Cal.4th at 299-304, the "victim" here (CSC) already received compensation from the alleged tortfeasor (Haskell) in the Washington Action.

The District Court correctly refused "to draw an inference of collusion and conspiracy based on [Landmark's] evident attempts to prevent" Haskell from taking CSC's documents. (ER37.) CSC does not (because it cannot) point to any "unambiguous contradictory evidence" that Haskell was acting within the scope of his employment with Landmark. The District Court's holding should be affirmed.

## 2. Appellees Are Not Directly Liable For Haskell's Conduct

### a. CSC Improperly Presents Unpled Theories On Appeal

Hoping to impute liability upon Appellees, CSC makes two arguments on appeal that it did not plead in its complaint. CSC accuses Kranske and Harrison of directly stealing documents from CSC. (*See, e.g.*, Op.Br. 4-5, 35, 50.) CSC also assigns error based on "Haskell's conduct after joining Landmark." (Op.Br. 33.) However, CSC's pleadings concern only Haskell's alleged theft as he left CSC – before he joined Landmark – and no theft by anyone else. (*See generally* ER1119-52; *see also* Dkt.169 at 7 (denying CSC leave to amend because "CSC's original causes of action in its amended complaint all relate to the alleged misappropriation of trade secrets by Haskell and the departure of Haskell from CSC").)

CSC "may not proceed on th[ese] theor[ies]" because CSC "failed to reference" them in its pleadings. *Surfvivor Media*, 460 F.3d at 631; *Rent Info. Technology*, 2008 U.S.App. LEXIS 4675 at *5 (plaintiff "cannot bootstrap its new…argument onto its…claim because [it] failed to allege…particular facts supporting the new theory…"). CSC's new theories are barred.

58

### b. CSC's "Ratification" Argument Is Barred And Meritless

CSC claims for the first time on appeal that Appellees "ratified" Haskell's purported misconduct. (Op.Br. 2, 26, 28, 31-43.) CSC waived the new "ratification" argument by failing to raise it before the District Court. *Silvas v. E*Trade Mortg. Corp.*, 514 F.3d 1001, 1007 (9th Cir.2008) ("[I]t is well established that an appellate court will not consider issues on appeal that were not properly raised before the district court."). Thus, this Court should bar CSC's ratification theory raised for the first time appeal.

In any event, CSC's new ratification theory is unsupported by the evidence it cites. CSC points to: CSC's "timeline" (Op.Br. 34-35); Appellees "conced[ing] 'access'" to CSC materials purportedly found on Landmark computers (Op.Br. 32, 40); Haskell's "offer[ ] to share…CSC materials in his possession" (Op.Br. 37); CSC's lawsuit against Haskell and the "numerous CSC files [that] were discovered on Landmark's computers" which should have put Landmark "on notice that stolen CSC documents were in its possession" (Op.Br. 37-40); Haskell's "admitt[ing] in his deposition to taking CSC financial information" (Op.Br. 38); the Landmark Parties purported failure to "investigate" Haskell's alleged misconduct, their continued employment and promotion of Haskell, and their continued "possession of CSC materials" and (Op.Br. 38 n.11, 41-43). None of this "evidence" amounts to "ratification" of Haskell's pre-Landmark-employment conduct.

An "originally unauthorized act may be ratified by implication where the only reasonable interpretation of the principal's conduct is consistent with approval or adoption." *Allied Mutual Ins. Co. v. Webb*, 91 Cal.App.4th 1190, 1194 (2001). "A principal's failure to promptly disaffirm an agent's conduct on his behalf constitutes ratification." *NORCAL Mutual Ins. Co. v. Newton*, 84 Cal.App.4th 64, 78 (2000). Evidence that an employer failed to terminate an employee charged with wrongdoing, standing alone and unsupported by any evidence indicating the employer's "approval of [the employee's] course, is never sufficient to establish ratification." *Edmunds v. Atchison, Topeka & Santa Fe Railroad Co.*, 174 Cal.246, 249 (1917).

None of CSC's "evidence" shows that Appellees knew that Haskell took CSC documents or that Haskell distributed them to others at Landmark. Appellees were entitled to rely upon Haskell's express conditions of employment absent clear evidence to the contrary – none of which surfaced until after Haskell was hired and CSC filed litigation. The District Court's refusal to accept CSC's unsupported conspiracy theories was proper.

### c.  CSC Misrepresents "Evidence" To Argue That Appellees Used CSC Materials

CSC produced no admissible evidence that Appellees directly or knowingly took, used or modified any CSC materials. (*See* ER37.) Instead, CSC resorts to mischaracterizing the evidence.

For example, CSC's misrepresents evidence in contending that it found "numerous files on Landmark computers" which changed "CSC-specific metadata…to make the documents…appear to have been authored by Landmark." (Op.Br. 17-19, 47; Dkt. 251 at 9, 18.) The evidence actually shows one file – not "numerous files" – was found on Haskell's Landmark computer (and Haskell's CSC computer) – not on multiple "Landmark computers." (Op.Br. 17-18; Dkt. 291 (Opp.) at 18; ER90-92 ¶¶ 20-27.) The District Court properly concluded that CSC's expert "is clearly referring to what she discovered on *Haskell's* computer, not on Kranske's or Harrison's…CSC thus provides no evidence that either Kranske or Harrison was the one who changed the metadata, nor that they knew that the metadata was altered." (ER38; *see also* SER0015 (CSC's counsel admitting that it was "absolutely true" that CSC had "no direct evidence" Kranske changed metadata.).)

Similarly, CSC misstates the evidence it cites concerning USB devices "potentially containing CSC documents" – which CSC claims were "used on Landmark computers [and] contained "CSC files." (Op.Br. 20 (citing ER1042, 1044, 257-59, 299, 306).) However, this "evidence" shows only a forensic analysis of Haskell's home and CSC computers – not of Landmark computers. (*Id.*)[11/]

---

11. CSC's citations to the Goodman Report and declaration for this theory are precluded because CSC failed to cite them for the District Court. *See* Section (cont'd)

CSC also contends that a former Landmark employee admitted using "electronic copies" of CSC's Deployment Workbook. (Op.Br. 11-12.) However, the deployment sheets that was the subject of that testimony was Landmark's deployment sheets – not CSC's. (*See* SER0041-45, 0056-62; 0066-102; 0103-40; 0141-81.)

Again, the District Court properly rejected CSC"s misrepresentations of the evidence. CSC's conspiracy theories are groundless.

### d. CSC Has No Evidence That Harrison Or Kranske Knew Or Should Have Known Haskell Took CSC Documents

Appellees expressly forbade Haskell from taking CSC documents and did not learn about Haskell's alleged misappropriation until after hiring him. (ER342-43 ¶¶3-6; 345-53.) Kranske reminded Haskell not to use CSC materials. (ER213-14.) CSC cites no evidence to support its speculation that this evidence was illusory.

CSC suggests that Appellees "knew" that Haskell misappropriated CSC's alleged trade secrets (*see* Op.Br. 14-20, 28, 33-36, 38-48) but ignores the fact that all of CSC's "evidence" came after Haskell was hired by Appellees and only came

---

(cont'd)

V.F.1 *infra*. Moreover, Goodman's report does not provide any foundation for her statements of fact therein.

to light during CSC-initiated litigation. (*See* ER86-97 ¶¶4-5; 293-306; 1021-86; 145-47; 117; 119-20; 165; 213-14, 218; 257-59.)

To support its "story of suspicion and conspiracy," as set forth in Section IV.B.3 *supra*, CSC relies on a string of unrelated events based on inadmissible evidence, mischaracterizations of other evidence and speculation. (Op.Br. 26, 34-37.) CSC does not provide any admissible evidence that Appellees knew or were aware of Haskell's purported misconduct before they hired him. The District Court properly refused to accept CSC's unsupported conspiracy theories.

### e.    CSC Confuses Speculation With Inferences

The District Court acknowledged "its duty to draw inferences in CSC's favor" but properly concluded that "these inferences must be reasonable and based on admissible evidence." (ER37.) The cases make clear that CSC is entitled to only "reasonable inferences" not "inferences that are based solely on speculation." *LVRC Holdings*, 581 F.3d at 1136. The Supreme Court has also made clear that the summary judgment standard does not require that all ambiguities in the evidence be resolved in favor of non-moving party. *Lujan*, 497 U.S. at 888. The object of summary judgment "is not to replace conclusory allegations of the complaint…with conclusory allegations of an affidavit." *Lujan*, 497 U.S. at 888; *see also Lakeside-Scott v. Multnomah County*, 556 F.3d 797, 802 (9th Cir.2009) ("a reasonable inference 'cannot be supported by only threadbare conclusory statements'").

CSC contends its speculation is "circumstantial evidence." (Op.Br. 30, 31, 34-35.) "Circumstantial evidence" is evidence "applied to the principal fact, indirectly, or through the medium of other facts, from which the principal fact is inferred." *Ajaxo, Inc. v. E*Trade Group, Inc.*, 135 Cal.App.4th 21, 50-51 (2005). However, circumstantial evidence must be "sufficient to permit reasonable inferences." *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Assn.*, 809 F.2d 626, 631 (9th Cir.1987).

As detailed in Section IV.B.3 *supra*, CSC's dark tale of conspiracy is pure fiction, based on mischaracterizations of evidence. For example, CSC claims Harrison targeted Haskell on a "Key Personnel" list when the reality is that the list involved "Potential Key Personnel Who Have Inquired Or May Inquire About Employment With Landmark." (Op.Br. 6; ER244, 1077.)

CSC's suggestion that the District Court labeled unrelated events as "coincidence" (Op.Br. 37) misses the mark. CSC bore the burden of producing evidence supporting its contentions. Having failed to do so, CSC cannot mask its lack of evidence by ascribing error to the District Court for rejecting its speculation and misrepresentations of the evidence. The District Court's order should be affirmed.

**F.    CSC IMPROPERLY RELIES UPON INADMISSIBLE EVIDENCE**

**AND EVIDENCE IT DID NOT CITE TO THE DISTRICT COURT**

### 1.    CSC Cannot Rely On Evidence Not Cited Below

On appeal, CSC relies upon evidence that it did not cite to the District Court below in support of its ultimate contention that the District Court improperly decided there were no triable issues of fact.  (*See* Op.Br. 5, 7-9, 20-21, 35,-36, 42.) CSC cites numerous documents in its forensic expert report (the "Goodman Report") and declaration (Op.Br. 5, 8-10, 12-14, 17-21, 31, 35-36,41, 47, 50, 54-55, 58-59, 62-64)),[12] three emails Haskell supposedly sent to himself (Op.Br. 7, 36)[13] and emails between Harrison and a lawyer who advised Haskell.  (Op.Br. 8, 36; *see also* ER237-41; Dkt. 291 ¶365.)

CSC's failure to cite to these documents to the District Court below precludes CSC from relying upon them here.  *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir.2001).  In *Carmen*, plaintiff relied on evidence on appeal that was in the record below but not specifically referenced in

---

12.    The Goodman Report was over 200 pages of "documents consisting of forensic data reports, various Landmark deployment sheets, guidelines and business estimates, and additional deployment workbooks."  (SER0341 ¶116; SER0667-892.)

13.    CSC's failure to bring these emails to the District Court's attention led (in part) to the ruling below that CSC's evidence concerning the emails violated the best evidence rule.  (ER15-16 ("CSC also presents deposition testimony by Haskell about emails he purportedly sent to himself, but CSC never provides the actual emails.").)

her papers opposing a motion for summary judgment before the district court. *Id.* at 1028-30. The *Carmen* court affirmed, holding that "whether there is a genuine issue of fact, on summary judgment," the "district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers *with adequate references so that it could conveniently be found*." *Id.* at 1031 (emphasis added); *see also Forsberg v. Pacific Northwest Bell Tele. Co*., 840 F.2d 1409, 1417-18 (9th Cir.1987) (holding that a "district judge is not required to comb the record to find some reason to deny a motion for summary judgment" and precluding party from arguing error on appeal for failure to consider a document not identified below).

Like *Carmen* and *Forsberg*, CSC relies upon documents on appeal which it failed to bring to the District Court's attention. CSC made a blanket citation to the Goodman Report – 226 pages of "Ex. G" in its Statement of Genuine Issues but failed to cite to specific documents. (*See* SER0431 ¶ 334.)[14] CSC also failed to cite to the District Court the emails on which it now relies. (*See* Op.Br. 7, 8 & 36.) Under *Carmen* and *Forsberg*, CSC cannot rely upon evidence on appeal that it did

---

14. Specifically, CSC relies upon documents in ER 93-97, 293-306, 1026-28, 1030-36, 1039, 1042, 1044 & 1069-73 which were not cited before the District Court. (Op.Br. 4-5, 8-11, 14, 16-20, 36, 39-40, 41-42, 44-45, 49-50; *compare generally* Dkt. No. 251 (Opp.) & SER0282-466.)

not adequately reference before the District Court. This Court should disregard this "evidence."[15/]

## 2. CSC's Failure To Appeal The District Court's Evidentiary Rulings Precludes Citations To Excluded Evidence

The District Court sustained certain objections filed by Appellees to CSC's evidence. (ER14-17.) CSC's Opening Brief does not challenge the District Court's rulings. CSC also does not provide the documents in its excerpts of record required by this Court's rules to challenge evidentiary rulings. *See* 9th Cir.R.30-1.4(a)(vii)).

This Court "has repeatedly admonished that [it] cannot 'manufacture arguments for an appellant' and therefore…will not consider any claims that were not actually argued in appellant's opening brief." *Independent Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir.2003)). Thus, this Court reviews "only issues which are argued specifically and distinctly in a party's opening brief." *Id.*

---

15. The *Carmen* court also held that failing to cite evidence in opposition to a motion for summary judgment is "also profoundly unfair to the movant" because it "is denied a fair opportunity to address the matter in reply papers." *Carmen*, 237 F.3d at 1031. If CSC had cited these documents below, for example, the Landmark Parties would have been able to respond that Goodman had no foundation for her statement that creating Deployment Workbook requires an "in-depth understanding of Excel"– particularly in light of CSC's testimony that this CSC's personnel did not require any training to create and modify this form. (SER0446 ¶ 400; SER0198 (Uribe dep.); SER0267 (Brock dep.).) Goodman's statements are properly excluded. *Guidroz-Brault v. Missouri Pacific Railroad Co.*, 254 F.3d 825, 831 (9th Cir.2001) (excluding expert testimony because it contained unsupported speculation, subjective beliefs and unsubstantiated assumptions).

CSC has waived the ability to appeal from the District Court's evidentiary rulings and cannot rely upon stricken and inadmissible evidence on this appeal. Thus, CSC's citations and reliance upon evidence struck by the District Court are improper. (*See* Op.Br. 9 n.2 (references to Haskell's CSC employment agreement (ER311-22)); *Id.* at 7, 36 (references to emails Haskell sent himself (ER221-29)); *Id.* at 8 (references to emails between Harrison and Serratore (ER237-41)); *Id.* at 7, 9, 36 (no personal knowledge (ER62-63, 1026)); *Id.* at 8, 35-36 (statements concerning documents not presented into evidence (ER88-95, 1026, 1033-34); *Id.* at 5n.1, 8, 9, 20-21, 35, 42 (factual content of declarations in Washington Action (ER257-59.) This Court should disregard this inadmissible evidence.

## G. <u>CSC PRESENTED NO ADMISSIBLE EVIDENCE THAT APPELLEES CAUSED ANY DAMAGES</u>

The District Court's summary judgment may be affirmed on the alternative ground that CSC presented no admissible evidence that Appellees caused it any damages. CUTSA provides that a plaintiff "may recover damages for the actual loss caused by misappropriation." Cal.Civ.Code §3426.3(a). A plaintiff must show that it was "actually damaged by the misappropriation or the defendant was unjustly enriched by such misappropriation and use." *Fas Technologies, Ltd. v. Dainippon Screen Mfg*., 2001 U.S.Dist.LEXIS 7503 at *10-11 (N.D.Cal. 2001).

CSC's only evidence of its damages submitted before the District Court was the CSC Damages Report. (SER0982-89.) The CSC Damages Report presented

CSC's claimed damages of "likely Net Lost Profits." (SER0984-85.) However, the CSC Damages Report failed to show that these "likely Net Lost Profits" were caused by Appellees' alleged misappropriation or other conduct. (SER0986-89.) Indeed, CSC admitted that its "financial expert was not retained to opine on causation." (SER0419 ¶260).)

CSC failed to show that Appellees caused any damages for misappropriation. The District Court's order can be affirmed on this alternative basis.

## VI.

## <u>CONCLUSION</u>

For all the foregoing reasons, therefore, Appellees Landmark Event Staffing Services, Inc., Peter Kranske and Michael Harrison respectfully requests that the Court affirm the summary judgment granted by the District Court in their favor against Appellant Contemporary Services Corporation.

DATED: October 5, 2015

THE AVANZADO LAW FIRM

By:_____
     Melvin N.A. Avanzado
Attorneys for Defendants and Appellees
Landmark Event Staffing Services, Inc.,
Peter Kranske and Michael Harrison

**CERTIFICATE OF COMPLIANCE**

Appellees and their undersigned counsel hereby certify that this brief

complies with the length limits set forth at 32(a)(7) of the Ninth Circuit Rules, that

the type size and type face comply with Rules 32(a)(5) and (6) of the Federal Rules

of Appellate Procedure and that this brief contains 13,883 words excluding the

cover, corporate disclosure statement, tables of contents and authorities, statement

of related cases and this certificate of compliance.

DATED:  October 5, 2015

| | THE AVANZADO LAW FIRM |

By:_____
          Melvin N.A. Avanzado
Attorneys for Defendants and Appellees
Landmark Event Staffing Services, Inc.,
Peter Kranske and Michael Harrison

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Appellees are not aware of any related

case pending before this Court.

DATED: October 5, 2015

THE AVANZADO LAW FIRM

By: _____

Melvin N.A. Avanzado
Attorneys for Defendants and Appellees
Landmark Event Staffing Services, Inc.,
Peter Kranske and Michael Harrison

9th Circuit Case Number(s)

14-56636

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date)

10/05/2015 .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format)

s/Elaine W. Yu

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)